UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| DEBRA WALLER,<br>as personal representative of the estate of<br>Rodney Howard,<br><br>  Plaintiff,<br><br>v.<br><br>TERRY COUNTY, TEXAS, et al.,<br><br>  Defendants. | No. 5:21-CV-189-H |

### MEMORANDUM OPINION AND ORDER

Rodney Howard committed suicide in the Terry County jail. His estate, through Debra Waller, brings this suit against the County and its officers, alleging that they failed to protect Howard and failed to supervise one another. Terry County Sheriff Timothy Click moves to dismiss the suit against him, arguing that the doctrine of qualified immunity shields him from liability.

To be liable, Click must have been aware of Howard's situation. Waller alleges that Click would have been informed of Howard's mental state on September 12, the day that Howard was served with a second indictment that caused the mental distress culminating in his suicide later that day. But County policy requiring notice to the Sheriff is triggered by a suicide attempt—not mental distress alone. And Waller makes no allegation that Click was otherwise aware of Howard's mental state on September 12. Indeed, Waller alleges no facts that would show Click had a reason to fear for Howard's safety after an MHMR representative cleared him in late August. Because she fails to allege facts that would show Click was deliberately indifferent to Howard's needs, Click's motion is granted. But, because it would not be futile, the Court grants Waller leave to amend her complaint.

1.    **Factual and Procedural History**

When evaluating a motion to dismiss, all of the plaintiff's well-pleaded allegations must be taken as true. *See Lovick v. Ritemoney Ltd.,* 378 F.3d 433, 437 (5th Cir. 2004). As a result, the Court draws its recitation of the facts from the complaint, noting disagreements between the parties along the way.

    A.    **Howard is arrested and held at the Terry County jail.**

Rodney Howard was booked into the Terry County Jail on August 2, 2019. ¶ 26.* Defendant Dominique Dominguez completed a medical screening and suicide evaluation at that time. ¶ 27. In response to Dominguez's questions, Howard indicated that he heard noises and voices that other people don't hear. ¶ 28. His responses to other questions suggested that he suffered from depression (¶ 29), PTSD (¶ 30), and anxiety (¶ 31). He indicated that he had previously received mental-health treatment. ¶ 32. And he reported that he had been diagnosed with schizophrenia, depression, and PTSD. ¶ 33. As the defendants admit, the Suicide Screening Form indicates that a "Yes" in response to questions "1a–1d" should result in the inmate being placed on suicide watch. ¶ 34. It is unclear from the record what questions 1a–1d are, though the Court draws the reasonable inference that at least one of the affirmative responses Howard gave was in response to one of those questions. ¶ 34; Dkt. No. 7 ¶ 27. And the defendants concede that they need not wait to speak to an MHMR (Mental Health/Mental Retardation) representative before placing the defendant on suicide watch. ¶ 36; Dkt. No. 7 ¶ 29. Howard was not placed on suicide watch but was housed in cell S-4. ¶¶ 38–40.

---

* Citations in this section are to the Complaint, Dkt. No. 1, unless otherwise stated.

i. **Howard attempts suicide.**

The next day, Howard attempted to hang himself. ¶¶ 45–49. The defendants deny this, but they admit that they went to his cell to assess Howard after he tied his bedsheet into a knotted loop. Dkt. No. 7 ¶¶ 38–42, 43, 45–48. Officers intervened and summoned MHMR for an assessment. ¶ 53. That assessment was conducted in a different cell—cell H-1. ¶ 56. During that assessment, Howard began slamming the door to his food slot on his fingers. ¶ 63. The MHMR representative reported that Howard needed to be kept on suicide watch. ¶ 64. The form completed to summarize the MHMR representative's interaction noted that she would be placing "Robles" on a 24-hour suicide watch and would conduct a face-to-face interview with "Robles." ¶ 66. It is reasonable to assume that "Robles" is a typo, but it is unclear what effect this typo has on Waller's claims. Regardless, Terry County had a policy at the time requiring that the Sheriff and jail administrator be notified of a suicide attempt. ¶ 68.

ii. **Howard attempts suicide again.**

On August 18, 2019, Howard was housed in cell S-4, the same cell in which he first attempted to hang himself. ¶¶ 72–75. The cell features bed sheets and various tie-off points. ¶ 74. The inmate in neighboring cell S-3 informed officers that Howard was going to kill himself. ¶ 72. Howard partially covered the camera that officers used to monitor his behavior. ¶ 77. He then attempted to insert a pencil down his throat and attempted to swallow a foreign object. ¶ 84. Officers responded to S-4 and escorted Howard to cell H-1, which is a suicide-watch cell. ¶ 81.

After an evaluation by MHMR, Howard was transported to the Brownfield Regional Medical Center and later to the UMC Health System in Lubbock. ¶ 87. There, doctors discovered that Howard had swallowed a number of pills and a razor blade and had

attempted to swallow a sharpened pencil. ¶¶ 91–92. Sheriff Click and Jail Administrator Johnson were informed of this incident. ¶ 98.

### iii. Howard is removed from suicide watch.

Upon return from the hospital following his August 19 incident, Howard was placed on suicide watch. ¶ 101. Another MHMR representative visited with Howard on August 21. ¶ 100. That individual—defendant Liz McGinnis—ordered an officer to remove Howard from suicide watch despite having access to the file reflecting Howard's two prior suicide attempts. ¶¶ 103–104. That file also, according to Waller, reflected that Howard had been prescribed a number of medications that may have increased Howard's suicidal ideation. ¶¶ 106–18. Howard was returned to a standard segregation cell like that in which he was originally housed. ¶ 121. On September 10, Howard slammed a door on his hand, injuring it. ¶ 127.

### iv. Howard commits suicide.

On September 12, Howard was served with an indictment that added another charge against him. ¶ 134. This upset Howard. Howard and Jail Administrator Johnson discussed the charges, and Johnson knew that Howard was "mad about the second charge being filed." ¶ 136. At the time, Howard was housed in cell S-11, which is not a suicide-watch cell. ¶¶ 151–52. It contained bed sheets and various tie-off points similar to the cell in which he was housed when he first attempted to hang himself in early August. ¶ 152–54; *see* ¶ 74.

Somehow, Howard was able to fashion a rope from mop strings. ¶ 163. Using his shower handle as a cleat, the metal grate covering the lightbulb in his shower as a gallows, and a plastic bag to restrain his hands, Howard hanged himself. ¶¶ 175– 85. Brain dead

when he was discovered, he was taken off of life support a few days later. ¶ 188. According to one jailer, defendant Corina Trevino, there was "[n]o telling how long he's been like that." ¶ 189. A phone call between Jail Administrator Johnson and Coleman County Sheriff Les Cogdill took place after Howard's death. ¶ 140. The Sheriff told Johnson that Howard's mother "kind of figured he would do something because he has been to prison and this would be his third time." *Id.* Johnson responded, "yeah that's the truth, he didn't want to go back—sure didn't." *Id.*

### B.     Howard's estate files suit.

Howard's executrix, Debra Waller, filed this suit under 42 U.S.C. § 1983 against Terry County, Sheriff Timothy Click, Jail Administrator Wayne Johnson, and a number of officers and MHMR employees. ¶¶ 2–10. The suit alleges four causes of action: failure to protect against all of the individual defendants; failure to supervise against Click and Johnson; a *Monell* claim for a pattern and practice of deliberate indifference against the County; and a wrongful-death claim against all defendants. ¶¶ 217–354. The Court previously dismissed Count Four—the wrongful-death claim—brought by Howard's mother, Sheila Harrington. Dkt. No. 26. She passed away, and the claim was personal to her, so there is no plaintiff to pursue it. *Id.* at 1. The Court also dismissed Timothy Wauson from this suit based on the plaintiff's concession that she could not prevail against him. *Id.*

### C.     Sheriff Click moves to dismiss on the basis of qualified immunity.

Timothy Click, Sheriff of Terry County, moves to dismiss the two remaining claims against him, arguing that the complaint fails to state a claim against him and that he is protected by the doctrine of qualified immunity. Dkt. No. 8. Waller has responded in opposition, arguing that Click was aware of sufficient facts from which he could draw the

inference that Howard posed a risk to himself, that Click actually drew that inference, and that clearly established law protected Howard from omissions like Click's.  Dkt. Nos. 15; 16.  Click has replied, so his motion is ripe.  Dkt. No. 19.

**2.     Governing Law**

Section 1983 "provides a claim against anyone who 'under color of any statute, ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights."  *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).  "A plaintiff makes out a [Section] 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'"  *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 23, 236 (5th Cir. 2008)).

But even if a defendant can be shown to have violated another's constitutional rights, the defendant may not be liable under Section 1983.  Defendants who perform discretionary duties—such as police officers and jailers, *see, e.g.*, *id.*—are entitled to invoke the judicially created doctrine of qualified immunity in response to a plaintiff's Section 1983 suit.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Cozzo v. Tangipahoa Par. Council,* 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  And, despite its name, when qualified immunity applies, it is absolute.  *Id.*  So unless a defendant violates rights that are "clearly established," the plaintiff cannot recover under Section 1983.  *Id.*

Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). The first step in determining whether the doctrine applies requires the Court to "decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted). But only if the violation is of a right that was "clearly established" at the time can the plaintiff defeat the defendant's invocation of qualified immunity. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019)

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In the typical case, the plaintiff "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation marks and citations omitted). This approach "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In rare cases, however, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *cf. Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)

(internal quotation marks and citation omitted). Likewise, the Supreme Court has stated that the purpose of the doctrine is to "give[ ] government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (citation omitted). "Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Harlow*, 457 U.S. at 807).

"Where public officials assert qualified immunity in a motion to dismiss, a district court must rule on the immunity question at that stage. It cannot defer that question until summary judgment. Nor can it permit discovery against the immunity-asserting defendants before it rules on their defense." *Carswell v. Camp*, 37 F.4th 1062, 1066 (5th Cir. 2022), *petition for rehearing en banc filed July 15, 2022*. A motion to dismiss based on qualified immunity is evaluated under the same pleading standards as a traditional motion to dismiss. *Terwilliger v. Reyna*, 4 F.4th 270, 279–80 (5th Cir. 2021).

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the plaintiff's allegations, which must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citation omitted).

The ultimate inquiry is "whether the complaint pleads facts that, if true, would permit the inference that [the defendant is liable] under [Section] 1983 . . . and would overcome [his] qualified immunity defense." *Terwilliger*, 4 F.4th at 280 (quoting *Hinojosa v. Livingston*, 807 F.3d 657, 664 (5th Cir. 2015)).

3.  Analysis

Under the Fourteenth Amendment, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The constitutional rights Waller seeks to vindicate (on Howard's behalf) thus "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). "A state may detain defendants for trial; its 'exercise of its power to hold detainees and prisoners, however, brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being.'" *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021) (quoting *Hare*, 74 F.3d at 638–39). "Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care." *Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019). Thus, "the Fourteenth Amendment protects pretrial detainees' right to medical care and to 'protection from known suicidal tendencies.'" *Est. of Bonilla ex rel. Bonilla v. Orange Cnty.*, 982 F.3d 298, 304 (5th Cir. 2020) (citation omitted).

When, as in this case, "a pretrial detainee's claim is based on a jail official's episodic acts or omissions . . . the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Hare*, 74 F.3d at 643. An official "violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference." *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 464 (5th Cir. 2015) (internal quotation marks and citation omitted).

In other words, "[t]o succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 755 (5th Cir. 2020)). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). "Negligence or even gross negligence is not enough: the officials must have had actual knowledge of the substantial risk." *Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021) (citing *Hare*, 74 F.3d at 650). Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot amount to deliberate indifference. *Farmer*, 511 U.S. at 838. But, under exceptional circumstances, an "official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Bias v. Woods*, 288 F. App'x 158, 162 (5th Cir. 2008) (citing *Farmer*, 511 U.S. at 842 & n.8).

– 10 –

"In the context of inmate suicide, 'to defeat qualified immunity, the plaintiffs must establish that the officers . . . were aware of a substantial and significant risk that the detainee might kill himself, but effectively disregarded it.'" *Cope*, 3 F.4th at 207 (quoting *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000)) (cleaned up). Waller must therefore plead more than "gross negligence in treating [the inmate's] mental health problems." *Young v. McCain*, 760 F. App'x 251, 256 (5th Cir. 2019). "Allegations of unsuccessful medical treatment, negligence, neglect, medical malpractice, or a mistaken judgment do not amount to deliberate indifference." *Id.* (citing *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991)). Because "suicide is inherently difficult to predict, particularly in the depressing prison setting . . . an incorrect diagnosis regarding the genuineness of a suicide threat does not amount to deliberate indifference." *Id.* (internal citation and quotation marks omitted). Nor does the failure to properly implement "adequate suicide prevention protocols." *Taylor v. Barkes*, 575 U.S. 822, 826 (2015); *see also Young*, 760 F. App'x at 257 (noting that "disagreement with a diagnostic measure" does not allege deliberate indifference). "[W]hile . . the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be." *Hyatt v. Thomas*, 843 F.3d 172, 177–78 (5th Cir. 2016) (quoting *Hare v. City of Corinth*, 135 F.3d 320, 328–29 (5th Cir. 1998)).

It is well-established that "[p]ersonal involvement is an essential element of a civil rights cause of action" under Section 1983. *Hinojosa v. Livingston*, 807 F.3d 657, 668 (5th Cir. 2015) (citing *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983)); *see Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (en banc). Officials are not liable for the

conduct of other officials. *See Hinojosa*, 807 F.3d at 668. Instead, each official's liability depends upon his or her "own actions." *Id.*; *see also Iqbal*, 556 U.S. at 677 (Under Section 1983, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

"A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). Courts routinely dismiss Section 1983 claims against officials when the complaint fails to allege that the official was personally involved in the claimed constitutional violation. *See, e.g., Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (dismissing claims because plaintiff failed to allege defendants, as supervisory corrections officers, had any direct responsibility for the delivery of a mailgram); *Carr v. Collier*, No. 6:18-CV-00351-TH, 2019 WL 3422939, at *3–4 (E.D. Tex. May 16, 2019) (recommending the dismissal of claims because the complaint failed to allege defendants, as supervisory prison officials, were personally involved in any alleged harassment perpetrated against the plaintiff).

### A.  Failure to Protect

Waller alleges that Click failed to protect Howard from a known risk of suicide. Dkt. No. 1 ¶¶ 229–34. In support, she alleges various facts: that Terry County had a policy requiring that Click be notified of suicide attempts (*Id.* at ¶ 68); that the policy had been followed in response to at least one of Howard's suicide attempts (the August 18 attempt) (*Id.* at ¶ 98; Dkt. No. 7 at ¶ 73); and that Johnson was aware of Howard's unbalanced state

on September 12, the day he killed himself (Dkt. No. 1 at ¶ 134–36). Click disputes none of those facts. The thrust of Click's motion to dismiss is that it is an unwarranted inference that he was actually informed of Howard's suicide attempts. Dkt. No. 8 at 11–14. The Court disagrees. At the motion to dismiss stage, the Court is permitted to draw reasonable inferences from the well-pleaded facts. *Iqbal*, 556 U.S. at 678. Here, those facts are that Click was informed, in accordance with official policy, of one suicide attempt. Dkt. No. 1 at ¶ 98; Dkt. No. 7 at ¶ 73. It is not unreasonable to infer that he would be informed of another.

Click responds by noting that Howard's behavior on the morning of September 12 (in response to the second indictment) does not amount to a suicide attempt that would trigger a reporting requirement under the Policy. Dkt. No. 19 at 7–8. Here, the Court agrees. As presently alleged by Waller, the events before Howard ultimately hanged himself do not amount to a "suicide attempt," as the policy requires. Dkt. No. 1 at ¶ 68. It is clear from the undisputed facts that Jail Administrator Johnson was concerned about Howard's mental state after receiving the second indictment. Dkt. No. 1 ¶¶ 136–41. Johnson proceeded to monitor Howard for the remainder of the day and acknowledged that Howard was angry and did not want to go back to prison. *Id.* Paragraph 202 of the complaint contains an accurate statement (based on the defendants' Answer) of what jailers are required to do if they believe a patient is mentally disturbed or suicidal: they must make a note and inform their shift replacements. *See* Dkt. No. 7 at 16. Contrast that policy with that governing actual suicide attempts, which requires that the Jail Administrator and Sheriff be made aware of such an attempt, and the problem for Waller becomes apparent. While Johnson may have had reason to be concerned about Howard's welfare, an inmate's

actions—not a jailer's concerns—are the trigger for the Policy's reporting requirement. Dkt. No. 1 ¶ 202. And Waller has not alleged that Howard's behavior in the morning and afternoon of September 12 amounted to a suicide attempt. As a result, Waller has not adequately pleaded that Click was aware of a risk to Howard's welfare on the night of September 12. Without that, her failure-to-protect claim against him cannot proceed.

Waller argues that, regardless of any notification, the risk of suicide was sufficiently obvious that a notification under the policy is unnecessary to establish that Click knew of a substantial risk to Howard's welfare. Dkt. No. 16 at 12–13. But the complaint makes clear that, following the August 18 suicide attempt, an MHMR professional cleared Howard to leave suicide watch. Dkt. No. 1 ¶ 104. That evaluation and recommendation by a mental-health professional must be credited. And, again, Waller alleges no facts that Johnson actually notified Click of Howard's mental state on September 10 (when he hurt his hand) or 12 (when he was served with the second indictment), so the last that Click would have heard, on Waller's telling, is that Howard attempted suicide but was removed from suicide watch in late August. *See* Dkt. No. 1 at ¶¶ 68, 99–104. The passage of nearly three weeks between Howard's suicide attempt and his hand injury—the next possible date on which Click might have learned of Howard's mental state—and the involvement of MHMR attenuates any knowledge Click might have had about Howard's condition.

In short, because Waller's complaint, on the most generous reading, fails to allege facts sufficient to demonstrate that Click violated Howard's constitutional rights, the complaint fails to pass the first hurdle of the qualified-immunity analysis. Because that failure alone is enough to warrant dismissal, the Court need not address the clearly established prong.

### B.     Failure to Supervise

To prevail on a failure-to-supervise claim, Waller must show that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Smith v. Brenoettsy,* 158 F.3d 908, 911–12 (5th Cir. 1998).  As explained above, Waller fails to adequately allege facts that could support subjective awareness on Click's part.  Therefore, she cannot establish the deliberate indifference required to prevail on her failure-to-supervise claim.  Like the failure-to-protect claim, it must be dismissed because it fails the first prong of the qualified-immunity analysis.

### 4.     Conclusion

At this preliminary stage, the Court asks not whether the plaintiff has succeeded or will succeed in her suit—only whether she could recover in the best-case scenario.  Even with that gloss, Waller's complaint shows no path to recovery against Click.  If Johnson and Click discussed Howard on September 12, the story may be different.  Since leave should be freely granted where an amendment may not be futile, the Court will permit Waller to amend her complaint.  Click's motion to dismiss (Dkt. No. 8) is granted.  Waller is granted 21 days from the date of this order to amend her complaint.

So ordered on August 11, 2022.

*[signature]*
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE