UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

DEBRA WALLER, as personal
representative of the estate of Rodney
Howard,

     Plaintiff,

v.

TERRY COUNTY, TEXAS, et al.,

     Defendants.

No. 5:21-CV-189-H

## MEMORANDUM OPINION AND ORDER

This case stems from the tragic suicide of Rodney Howard, who at the time of his death was an inmate at the Terry County Jail. The executrix of Howard's estate, Plaintiff Debra Waller, sued the Terry County Jail Administrator, Captain Wayne Johnson, for allegedly failing to protect Howard from a known risk of suicide. Captain Johnson then moved for summary judgment on the basis of qualified immunity, arguing that Waller failed to point to any competent summary-judgment evidence indicating that he knew of and disregarded a substantial risk that Howard would commit suicide. Given the evidence before the Court and binding precedent, the Court agrees. Captain Johnson testified that he did not believe Howard was a suicide risk at the time of the event, and that testimony is corroborated by uncontested evidence. Multiple weeks had passed since Howard's prior suicide attempt, mental-health professionals had removed Howard from suicide watch, and Howard spoke of his future and was calmly reading when Captain Johnson left for the day. Waller fails to identify any competent summary-judgment evidence to rebut these facts. Accordingly, the Court grants Captain Johnson's Motion for Summary Judgment (Dkt. No. 31).

1.    **Factual Background**

   A.    **Howard slams his head into a wall after being booked into jail, but medical personnel do not diagnose him with mental-health issues.**

Rodney Howard was booked into the Terry County Jail on August 2, 2019. Dkt. No. 33-1 at 26. A jail official completed an intake form, noting that Howard answered affirmatively that he "hear[d] noises or voices other people don't seem to hear," "fe[lt] down, depressed, or ha[d] little interest or pleasure in doing things" before his arrest, "ha[d] nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from [his] past," and was "extremely worried [he] w[ould] lose [his] job, position, spouse, significant other, [or] custody of [his] children due to arrest." *Id.* The intake official also confirmed that Howard had "received services for emotional or mental health problems" in the past and had been diagnosed with schizophrenia, depression, and PTSD. *Id.* The intake official noted, however, that he received no "information that [Howard] may be at risk of suicide"—specifically any information suggesting that Howard "th[ought] of killing or injuring [him]self," had "attempted suicide," or "fe[lt] hopeless" or like he "ha[d] nothing to look forward to." *Id.* Instructions on the intake form advised to "[p]lace [an] inmate on suicide watch" if the official answered affirmatively to the questions regarding the risk of suicide or "at any time [the] jailer/supervisor believe[d] it [wa]s warranted." *Id.* Howard was not placed on suicide watch at that time. *Id.*

That day, a judge set a bond for Howard, and Howard stated that "he didn't need no lawyer because he was going to kill himself." *Id.* at 46. When a jailer began to escort Howard out of the room, Howard "turned his head to the left side and hit his head on the wall." *Id.* Then Howard "fell onto the floor" and "appeared to be having a seizure." *Id.* Captain Wayne Johnson, who had served as the Jail Administrator for the Terry County

Jail for 28 years, responded and escorted Howard to the Brownfield Regional Medical
Center to receive medical treatment.  *Id.* at 46, 239, 244.  Captain Johnson provided records
noting that Howard was potentially suicidal to hospital staff to ensure that he would receive
mental—in addition to physical—treatment.  *Id.* at 46, 48, 239.  Howard was discharged
later that night with a note that despite his apparent drug abuse, he "was not suffering from
any anxiety or drug induced psychotic disorder or mood disorder and had suffered a
probable pseudo-seizure."  *Id.* at 50, 240.  Howard received post-discharge instructions
limited to managing seizures and drug abuse.  *Id.* at 50–55.

> **B.    Howard makes preparations to hang himself when jail officials do not
> provide him immediate access to the phone, and medical personnel clear
> him to be removed from suicide watch the next day.**

The next day, Howard was housed in segregation cell 4 (S-4), which is not a suicide-
watch cell.  Dkt. Nos. 1 ¶¶ 38, 40; 40 at 9–10.  Using the intercom in his cell, Howard
contacted a jail official working in the control room and threatened that if she did not "let
him use the phone," he "was going to hurt himself."  Dkt. No. 33-1 at 57.  The official then
observed Howard by camera as he "got his bedsheet, made it into a big loop and tied the
bottom into a knot."  *Id.*  The official advised a jailer of Howard's conduct, and the jailer
escorted Howard out of his cell to use the phone.  *Id.*  Howard became agitated and fell to
the floor several times while using the phone.  *Id.*  Howard stated that "he was trying to
make contact with his girlfriend" but "was unable to."  *Id.*

Howard was then placed in a holding cell, and a Mental Health and Mental
Retardation (MHMR) representative evaluated him.  *Id.* at 57–58.  During the evaluation,
Howard became angry and repeatedly closed a tray slot on his fingers.  *Id.* at 58.  MHMR
recommended that Howard be placed on suicide watch until he could meet with a

– 3 –

supervisor.  *Id.*  Accordingly, Howard was placed on suicide watch.  *Id.*  Captain Johnson was notified that Howard had been placed on suicide watch.  *Id.* at 240.

On August 4, 2019, pursuant to MHMR's recommendation, Howard was removed from suicide watch.[1]  *Id.* at 58, 240.  In a signed declaration, Captain Johnson states that he "perceived that Howard should be treated and evaluated by the mental health professionals at MHMR" and "deferred" to their evaluation.  *Id.* at 240.  And in light of MHMR's determination that Howard need not remain on suicide watch at that time, Captain Johnson "was not concerned that Howard was suicidal" and believed that "[Howard's] attitude and demeanor indicated . . . that his goal was not to harm himself, but [] instead to obtain what he wanted by throwing himself on the floor and making threats."  *Id.*

The day after that, Captain Johnson transported Howard to the hospital to receive treatment for swelling to his hand, and Howard was diagnosed with contusions to his hands and then returned to the jail.  *Id.* at 58, 240.  Captain Johnson states in his declaration that "Howard appeared in good spirits, made no statements that threate[ne]d self-harm, and did not appear to be depressed or sad" that day.  *Id.* at 240.

### C.   Howard swallows a razorblade and dozens of prescription pills, and medical personnel remove him from suicide watch three days later.

After MHMR removed Howard from suicide watch, Howard was placed back in S-4.  *Id.* at 84.  Between August 5, 2019, and August 18, 2019, Captain Johnson states that he "observed no concerning behaviors or actions from Howard and was not notified that he had exhibited any behaviors or made any statements indicating that he presented a risk of

---

[1] Under Terry County Jail policy, "only qualified Mental Health Personnel may discontinue or lessen the frequency of observations" of potentially suicidal inmates.  Dkt. No. 33-1 at 77.

harm to himself." *Id.* at 240.  Captain Johnson thus believed that "[Howard's] initial outbursts of violent actions that occurred his first week in jail had subsided." *Id.*

On August 18, 2019, a neighboring inmate called Control and advised that Howard "was going to kill himself." *Id.* at 84, 240.  At the time, the camera in Howard's cell was partially obstructed. *Id.* at 84.  The official who took the call ordered jailers to check on Howard, and Howard was escorted to a holding cell. *Id.*  Upon reviewing the camera footage, the official discovered that Howard had swallowed a pencil as well as another object that was hidden under his mattress. *Id.*  She alerted Captain Johnson of the situation, and Captain Johnson instructed her to "keep an eye on" Howard. *Id.*  Captain Johnson then took Howard to the Brownfield Regional Medical Center, where doctors determined that Howard needed to be treated at UMC Health System in Lubbock. *Id.*

At UMC Health System, doctors determined that Howard had swallowed 15 pills of Tegretol and 25 pills of a mixture of Tegretol, Keppra, and Seroquel. *Id.* at 90.  Howard had also swallowed a razorblade and attempted to swallow a sharpened pencil. *Id.*  Howard was discharged after Captain Johnson advised that Howard would be closely monitored and receive a psychiatric evaluation the next morning. *Id.* at 93, 241.

An MHMR representative evaluated Howard on August 19, 2019, and Howard remained on suicide watch. *Id.* at 241.  Two days later, another MHMR representative evaluated Howard and instructed that he be removed from suicide watch. *Id.* at 156, 241. Howard was placed in S-11, which contained various tie-off points, including a shower fixture and a metal grate covering the light in the shower area.  Dkt. No. 40 at 36, 38.

**D.**     **Howard becomes violent on two occasions, and Captain Johnson monitors security footage of Howard's cell and instructs a jailer to "keep an eye out" for violence from Howard.**

According to Captain Johnson's declaration, between August 21, 2019, and September 10, 2019, he "was aware of no issues with Howard's behavior and was not concerned that he was suicidal or behaving in a manner that indicated that he may harm himself." *Id.* at 241. Captain Johnson asserts that Howard "was always in good spirits" during that period and "did not cause any disciplinary issues." *Id.*

On September 10, 2019, Howard became upset because he could not reach his attorney, so he punched a wall. *Id.* at 158, 241. Captain Johnson accompanied Howard to the hospital, where he received treatment for his hand. *Id.* Captain Johnson states in his declaration that "[b]ecause Howard had caused injury to his own hand," he knew that hospital staff "took into account Howard's mental state as they treated him." *Id.* at 242. He also believed based on his experience taking inmates to the hospital that "had Howard showed any signs of mental distress or suicidal tendencies . . . [,] the medical staff would have recommended mental health treatment." *Id.*

Further, Captain Johnson asserts that at no time that day "did Howard appear to be suicidal, depressed, sad, or at risk of self-harm or suicide." *Id.* at 241. Rather, it was "[Captain Johnson's] impression that Howard had an anger problem because of his history of punching things and making threats towards jailers and jail staff when they did not comply with his requests as quickly as he wanted." *Id.*

On September 12, 2019, Captain Johnson served Howard with two indictments. *Id.* at 163–65, 242. Howard "was mad" that in addition to the initial charge of Aggravated Assault with a Deadly Weapon, he was also indicted for Unlawful Possession of a Firearm.

*Id.* at 242.  Howard said that "he did not do the things that he was accused of doing and did not want to go back to the penitentiary."  *Id.*  As averred by Captain Johnson in his declaration, "[n]ot wanting to go back to the penitentiary is not uncommon among inmates."  *Id.* at 243.  Captain Johnson also recounts in his declaration that at the time of their conversation, "Howard did not appear sad, depressed, suicidal or at risk of suicide" but, rather, "extremely angry and mad at the district attorney and grand jury for charging him with two offenses."  *Id.*  Captain Johnson spoke with Howard for "a few minutes about his legal problems"[2] in an attempt to calm him down, and Howard indicated that he would speak to his attorney about his charges.  *Id.* at 170, 242.

After their discussion, Captain Johnson returned Howard to his cell and, due to his "concern that Howard would have a violent outburst, similar to when he punched a wall" two days prior, he "verbally informed the day shift sergeant to keep an eye out for violence from Howard" and monitored Howard through a security camera in his cell until the end of his shift at 5:00 p.m.  *Id.* at 242–43.  In particular, Captain Johnson was concerned that Howard might "hit another wall, assault a jailer, or destroy jail property in a fit of rage" in response to the unexpected indictment.  *Id.* at 242.  During his surveillance, however, he observed that "instead of punching things or becoming violent," Howard "was calm and

---

[2] In his declaration, Captain Johnson states that he "spoke [with Howard] for almost an hour in [his] office about the legal system and how [Howard] could utilize his criminal defense attorney to present a defense to the charges."  Dkt. No. 33-1 at 242.  But on the Inmate Death Reporting Form, Captain Johnson provided that he only spoke with Howard about his legal problems for "a few minutes."  *Id.* at 170.  Therefore, viewing the evidence in the light most favorable to Waller, the Court takes the latter characterization as true.

laid on the mattress on his floor and read a book all afternoon," which is consistent with video evidence demonstrating Howard's conduct earlier that morning.[3]  *Id.* at 243; DX 21.

Therefore, based on Captain Johnson's prior experiences with Howard, including his discussion with him that afternoon—in which Howard indicated that he planned to discuss his charges with his attorney—and Howard's calm demeanor while Captain Johnson monitored him in his cell that afternoon, Captain Johnson states that he "was not concerned about Howard committing violence or being potentially suicidal when [he] left." *Id.* at 243. Although Captain Johnson admits that he "knew that Howard did not want to go back to the penitentiary," he states that "[Howard's] mood, outlook, statements, and plan to call his attorney caused [him] not to be concerned or perceive that he was at risk of suicide." *Id.* And because he did not perceive a suicide risk, he did not inform anyone that Howard was potentially suicidal or complete an incident report regarding Howard's anger after being served with a second indictment.[4]  *Id.* at 243, 248–49, 255.

### E.    Unnoticed by the jailers on duty, Howard hangs himself in his cell.

The official assigned to work in the control room that night "was responsible for monitoring approximately 93 cameras throughout the jail"—including the camera in Howard's cell—as well as a variety of other tasks, such as answering the phone and assisting

---

[3] Jail Administrator Matthew Torres states in a signed declaration that video footage after 12:58 p.m. that day is not available "because the Terry County Jail had contractors come to the jail that day to work on the audio/visual security system[,] and the recording function for cell S-11 as well as several other segregation cells was unintentionally de-selected."  Dkt. No. 33-1 at 6–7.

[4] Terry County Jail policy provides that:

Information regarding mentally disabled or suicidal inmates will be passed on from the jailer on duty to the oncoming jailer by verbal communication and by verbal reports.  Notations of a mentally disabled or potentially suicidal inmate will be made in the Jail Pass On notebook by the Sergeant or Jailer on duty.  If an incident occurs, the jailer on duty will complete an incident report.  All information will be passed on to the oncoming jailer.

Dkt. No. 33-1 at 75.

– 8 –

with booking.  *Id.* at 255.  The official "was not assigned to watch any one particular cell, but instead . . . to utilize the cameras to assist the jailers as they did their security checks." *Id.*  As a result, he did not notice any suspicious activity in Howard's cell.  *Id.* at 256.

The jailers on duty that night performed security checks on Howard's cell every 30 minutes.  *Id.* at 7; DX 35.  During one of those checks, a jailer found Howard hanging from a noose made of mop strings and attached to tie-off points in his cell.  Dkt. No. 33-1 at 192–93, 249.  Howard also used a trash bag to tie his hands behind his back.  *Id.* at 192, 249. Pursuant to the practice of the Terry County Jail, mops and trash bags "were given to inmates on a daily basis to clean their cells."[5]  *Id.* at 249.

Though his body remained limp, Howard was still alive.  *Id.* at 192.  The jailers cut Howard down, and he began having a seizure.  *Id.* at 192, 249.  Howard was transported to the Brownfield Regional Medical Center where he later passed away.  *Id.*

### F.   Captain Johnson discusses Howard's suicide with Sheriff Cogdill.

On a phone call between Captain Johnson and Coleman County Sheriff Les Cogdill the day after Howard hung himself, Sheriff Cogdill stated that Howard's mother "said she kind of figured he would do something."  PX 32 at 4:11–13.  Captain Johnson responded, "Mm-hmm."  *Id.* at 4:14.  Sheriff Cogdill further explained that Howard's mother believed Howard might "do something" because "he ha[d] been to prison[,] and this would be his third time down."  *Id.* at 4:13–16.  Captain Johnson responded, "Right," and added, "Yeah that's the truth, he didn't want to go back.  Sure didn't."  *Id.* at 4:17–23.

---

[5] For inmates determined to be a suicide risk, however, pursuant to Terry County Jail Policy, "[i]tems routinely removed" from their cells "include towels, blankets, shower curtains, mattress covers and any objects that may be used to harm the inmate."  Dkt. No. 33-1 at 75.  The policy does not specifically mention mops or trash bags.  *See id.*

## 2.    Procedural History

In September 2021, Howard's executrix, Debra Waller, filed this suit under 42

U.S.C. § 1983 against various defendants, including Captain Johnson, whom she alleges

failed to protect Howard from a known risk of suicide and failed to supervise his

subordinates as required by the Fourteenth Amendment.  Dkt. No. 1 ¶¶ 217–28; 235–41,

270–81.  The Court previously dismissed certain counts and defendants.  *See* Dkt. Nos. 26;

28.  In addition, Waller has voluntarily dropped certain claims, including the failure-to-train

claim against Captain Johnson.  Dkt. No. 39 at 7.  Therefore, the only claim remaining

against Captain Johnson is the failure-to-protect claim.

The Court previously ordered each defendant who asserted the affirmative defense of

qualified immunity, including Captain Johnson, to file a motion regarding qualified

immunity so that the Court—in accordance with Fifth Circuit precedent—could resolve that

issue before permitting discovery and other pretrial proceedings.  Dkt. No. 29.  In response

to the Court's order, and at issue here, Captain Johnson moved for summary judgment,

arguing that the record fails to establish that he was aware of a substantial risk that Howard

would attempt suicide and that, even if it did, it fails to establish that he acted with

deliberate indifference to that risk.  Dkt. Nos. 31; 32 at 47–53.  Waller responded in

opposition (Dkt. Nos. 38; 39), and Captain Johnson replied (Dkt. No. 46).  The motion for

summary judgment is ripe for review.

## 3.     Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "[A] fact is 'material' if its resolution could affect the outcome of the

action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (cleaned up). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 225 (5th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The moving party "bears the initial responsibility of . . . demonstrating the absence of a genuine issue of material fact." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up). Where the "burden at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Wesley v. Gen. Drivers, Warehousemen & Helpers Loc. 745*, 660 F.3d 211, 213 (5th Cir. 2011) (quoting *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010)). A defendant's assertion of qualified immunity, however, alters the usual burden of proof, "shifting it to the plaintiff to show that the defense is not available." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)). Once the qualified-immunity defense is invoked, "'[t]he plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct' according to that law." *Kokesh v. Curlee*, 14 F.4th 382, 392 (5th Cir. 2021) (quoting *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)).

"Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn.*

*Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992)).  Rather, once the burden of proof has shifted to the non-movant, she must "identify specific evidence in the record and [] articulate the precise manner in which that evidence supports his or her claim." *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (stating that Rule 56 "requires the nonmoving party to go beyond the pleadings" and use evidence to "designate specific facts showing that there is a genuine issue for trial") (internal quotation marks and citation omitted).

At the summary-judgment stage, a court must "view the facts in the light most favorable to . . . the nonmoving party." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 603 (2015)). "[W]hen facts are disputed and significant factual gaps remain," the court "must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the [non-movant]." *Lytle v. Bexar County*, 560 F.3d 404, 412 (5th Cir. 2009).  But it should ignore any version of the facts that "is blatantly contradicted by the record" so that no reasonable jury could believe it. *Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### B.    Section 1983 and Qualified Immunity

Section 1983 "provides a claim against anyone who 'under color of any statute, ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting 42 U.S.C. § 1983).  "A plaintiff makes out a [Section] 1983 claim if [s]he 'show[s] a violation of the Constitution or of federal law, and then show[s] that the violation was committed by someone acting under

color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (third and fourth alteration in original) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

But even if a defendant can be shown to have violated another's constitutional rights, the defendant may not be liable under Section 1983. Defendants who perform discretionary duties—such as police officers and jailers, *see, e.g.*, *id.*—are entitled to invoke the judicially created doctrine of qualified immunity in response to a plaintiff's Section 1983 suit. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Cozzo v. Tangipahoa Parish Council—President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Likewise, it has stated that the purpose of the doctrine is to "give[] government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotation omitted).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Id.* at 655–56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). And the second "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (alterations in original) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). A court may "analyze

the prongs in either order or resolve the case on a single prong." *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) (quoting *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In the typical case, the plaintiff "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation marks and citations omitted). This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Moreover, in rare cases, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *cf. Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

## C.     Deliberate Indifference to Known Suicide Risk

States have a duty under the Fourteenth Amendment to provide pretrial detainees "with basic human needs, including medical care and protection from harm, during their confinement." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996)). The Fifth Circuit has "repeatedly held" that this right requires protection "from a known risk of suicide*." Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020). And "it is well-settled law that jail officials violate this right if

'they [have] actual knowledge of [a] substantial risk of suicide and respond[ ] with deliberate indifference.'" *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021) (alteration in original) (quoting *id.*). But "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). "In the context of inmate suicide, 'to defeat qualified immunity, the plaintiff[] must establish that the officer[] . . . w[as] aware of a substantial and significant risk that [the detainee] might kill [him]self, but effectively disregarded it.'" *Cope v. Cogdill*, 3 F.4th 198, 207 (5th Cir. 2021) (quoting *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000)).

Where "a pretrial detainee's [deliberate-indifference] claim is based on a jail official's episodic acts or omissions," as opposed to general conditions, practices, or rules of pretrial confinement, "the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Id.* at 206. The plaintiff must show both "that (1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer*, 964 F.3d at 380 (quoting *Domino*, 239 F.3d at 755). It is not enough that an official merely "should have known" of such a risk. *Crandel v. Hall*, No. 22-10360, 2023 WL 4877464, at *4 (5th Cir. Aug. 1, 2023) (quoting *Converse*, 961 F.3d at 775).

Absent direct evidence, "[w]hether a prison official had the requisite knowledge of a substantial risk [of suicide] is a question of fact subject to . . . inference from circumstantial evidence." *Farmer*, 511 U.S. 825, 842 (1994). For example, when a complaint alleges that a risk "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it," a jury

could reasonably infer "that the defendant-official had actual knowledge of the risk." *Id.* at 842–43 (internal citation and quotation marks omitted).  Knowledge "may be inferred if the risk was obvious." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).  But when an official presents direct, unrebutted evidence that he did not believe that there was an actual risk of suicide, the Fifth Circuit has held that no reasonable jury could find deliberate indifference. *See Domino*, 239 F.3d at 756.

To establish deliberate indifference, the plaintiff must also show that the defendant "fail[ed] to take reasonable measures to abate" a known risk of suicide.  *Sanchez*, 995 F.3d at 473 (quoting *Converse*, 961 F.3d at 776).  "[W]hile . . . the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk," courts have agreed that the law is not "established with any clarity as to what those measures must be." *Hyatt*, 843 F.3d at 177–78 (quoting *Hare v. City of Corinth*, 135 F.3d 320, 328–29 (5th Cir. 1998)).  The Fifth Circuit has, however, indicated that an official fails to take reasonable measures to abate a known risk of suicide by "refus[ing] to treat [a detainee], ignor[ing] his complaints, intentionally treat[ing] him incorrectly, or engag[ing] in [] similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

### 4.   Analysis

#### A.   The summary-judgment evidence could support a finding that Captain Johnson was aware of facts from which he could have inferred that Howard posed a substantial suicide risk.

The Court must first determine whether, viewing the evidence in the light most favorable to Waller, a reasonable jury could find that Captain Johnson "was 'aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists.'" *See Dyer*, 964 F.3d at 380 (quoting *Domino*, 239 F.3d at 755). The record shows that Captain Johnson knew that Howard (1) had several violent, emotional outbursts after being booked into jail; and (2) attempted or made preparations for suicide on two occasions. As detailed below, this evidence could support a finding that Captain Johnson was aware of facts from which he could have inferred that Howard posed a suicide risk.

First, as for Howard's outbursts, Captain Johnson either personally witnessed or received a report detailing the following conduct: Howard slamming his head into a wall after a bond hearing; Howard becoming agitated and falling to the floor when his girlfriend ignored his calls; Howard punching a wall when he could not reach his attorney; and Howard becoming angry when served with an unexpected indictment.

As a general matter, "[a]nger, hostility, and belligerence are not uncommon displays of conduct by pretrial detainees." *Pena Arita v. United States*, 470 F. Supp. 3d 663, 703 (S.D. Tex. 2020) (quoting *Posey v. Sw. Bell Tel. L.P.*, 430 F. Supp. 2d 616, 623 (N.D. Tex. 2006)). The Fifth Circuit applied this principle in *Branton v. City of Moss Point*, 261 F. App'x 659, 660 (5th Cir. 2008). There, when a detainee was issued a DUI citation, he remarked that "he would lose his job, home, and everything." *Id.* at 660. He subsequently "became violent," "punch[ed] a hole in the wall," and "started a fight" with a police officer. *Id.* After being subdued, he commented that "his life was going to be over" and that the officer "might as well shoot him." *Id.* Officers escorted the detainee to a cell for intoxicated and combative prisoners and, two hours later, a jailer discovered him hanging in his cell. *Id.* Nonetheless, the court held that neither the detainee's externally directed violence, nor his "off-hand, cavalier comments" while intoxicated, established a risk that he would harm himself. *Id.* at

661.  In light of this precedent, to the extent Howard was merely hostile, belligerent, distraught, or erratic—or directed his violence externally—his conduct failed to support a reasonable inference that he posed a substantial risk of suicide.

But some of Howard's outbursts differed from those addressed in these cases because Howard inflicted injury on *himself*.  And courts within the Fifth Circuit have found that evidence of an inmate's self-harming behavior could support a reasonable inference that he is suicidal.  *See, e.g.*, *Landry v. Tex. Dep't of Crim. Just.*, No. CV H-17-370, 2020 WL 3077562, at *8 (S.D. Tex. June 10, 2020) (finding that officers were "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed" when an inmate "tried to slam his head against the wall" and, on another occasion, "r[a]n headfirst into a wall").  That conclusion is further supported by the fact that before one of his violent episodes, Howard stated that he was going to kill himself—a fact that was recorded and transmitted to Captain Johnson.  *See* Dkt. No. 33-1 at 46, 239.  Thus, a jury could reasonably find that the facts known to Captain Johnson concerning Howard's self-harming behavior supported an inference that he posed a suicide risk.

Second, Captain Johnson knew that Howard fashioned a noose with bedsheets in his cell—apparently preparing to hang himself—and, later, swallowed dozens of pills and sharp objects in an attempt to kill himself.  Both incidents occurred less than six weeks before Howard successfully committed suicide.  *See* Dkt. No. 33-1 at 57, 84.  The Fifth Circuit has made clear that evidence of a detainee's recent suicide attempts can support a reasonable inference that a substantial risk of suicide exists.  *See Hyatt*, 843 F.3d at 178 (holding that evidence that a detainee "had a history of depression" and "had recently attempted suicide" supported a reasonable inference that he was a suicide risk); *see also Shepard v. Hansford*

– 18 –

*County*, 110 F. Supp. 3d 696, 709 (N.D. Tex. 2015) (finding that evidence of a detainee's suicide attempt 18 months prior was not too "remote in time . . . to establish a substantial risk of suicide"). Therefore, a jury could reasonably find that the facts known by Captain Johnson related to Howard's prior, recent suicide attempts—or preparations to commit suicide—supported an inference that Howard posed a suicide risk.

Viewed in the light most favorable to Waller, the Court finds that the summary-judgment evidence supports a finding that Captain Johnson was aware of facts—specifically regarding Howard's prior self-harming behavior and suicide attempts—from which he could have drawn the inference that Howard presented a suicide risk.

### B.   Nonetheless, the summary-judgment evidence fails to support a finding that Captain Johnson actually perceived Howard to be a suicide risk.

Although the record supports a finding that Captain Johnson was aware of facts from which he could have drawn the inference that Howard posed a suicide risk, the Court must next determine whether the record could support a finding that Captain Johnson actually drew that inference. *See Dyer*, 964 F.3d at 380 (quoting *Domino*, 239 F.3d at 755). Because (1) Captain Johnson has set forth direct evidence establishing that he did not draw that inference, (2) other competent summary-judgment evidence corroborates his testimony, and (3) Waller has failed to cite to any competent summary-judgment evidence in rebuttal, no reasonable jury could find that he drew such an inference.

The Fifth Circuit has held that a jury could find that an official "ha[d] the requisite subjective knowledge when circumstantial evidence direct[ed] [him] to the specific risk of suicide." *Edmiston v. Borrego*, No. 22-50102, 2023 WL 4877467, at *7 (5th Cir. Aug. 1, 2023) (citing examples). And Captain Johnson indisputably knew of Howard's prior suicide

attempts and self-injuring conduct, which could have directed him to believe that Howard remained a suicide risk.

Here, however, Captain Johnson has produced uncontroverted, direct evidence that belies any inference that he actually perceived Howard to be a suicide risk at the time of the event. In particular, he states in his declaration that he relied on the opinions of medical professionals who evaluated Howard after each episode and either (1) did not identify a suicide risk, or (2) despite initially identifying a suicide risk, removed Howard from suicide watch shortly thereafter. Dkt. No. 33-1 at 239–43. Further, Captain Johnson asserts that he attributed Howard's violent conduct to his "anger problem" given "his history of punching things and making threats towards jailers and jail staff when they did not comply with his requests as quickly as he wanted." *Id.* at 241. And, apart from those incidents where medical professionals evaluated Howard, Captain Johnson did not observe or receive reports of any suspicious behavior from Howard. *Id.* at 239–43. In light of these facts, Captain Johnson declares under penalty of perjury that he did not perceive Howard to pose a legitimate suicide threat despite knowing of his troubled history.

The Fifth Circuit addressed similar evidence in *Domino.* 239 F.3d 752. There, a prison official was aware that an inmate "had a long history of psychological problems" and had "attempted suicide several times." *Id.* at 753. He treated the inmate on several occasions, and, during their last meeting, the inmate stated, "I can be suicidal," and began banging his head on the table. *Id.* The official sent the inmate back to his cell, where he hung himself two hours later. *Id.* Nonetheless, the Fifth Circuit held that no genuine dispute of material fact remained as to whether the official acted with deliberate indifference because the official presented evidence that the inmate "had been a difficult, often

uncooperative patient" and that he believed that the inmate "was threatening suicide to obtain secondary gain." *Id.* at 756. Reversing the district court's denial of summary judgment, the Fifth Circuit concluded that, despite the official's incorrect diagnosis, the evidence established that he "did not believe the threat [of suicide] was genuine." *Id.*

Similarly, here, although Captain Johnson may have misjudged Howard's condition, he has set forth substantial, unrebutted evidence that—although he knew of Howard's past suicide attempts and self-harming behavior—he did not actually draw the inference that Howard presented a legitimate suicide risk.

Captain Johnson's assertions are further bolstered by the fact that after he served the indictments on Howard—the event that allegedly prompted him to take his life—Howard indicated that he planned to contact his attorney, negating any inference that he intended to take his life that night. Dkt. No. 33-1 at 243. Captain Johnson also declares under penalty of perjury that although Howard became angry upon being served with the indictments, he "did not appear sad, depressed, suicidal or at risk of suicide." *Id.* at 242. Moreover, several weeks had passed since Howard's last suicide attempt, and mental-health professionals had since removed Howard from suicide watch. *Id.* at 93, 156, 240–41. And after delivering the news regarding Howard's new charges, Captain Johnson observed that he did not act in any violent or suspicious manner but, rather, appeared calm and was reading a book on his mattress. *Id.* at 242–43. This evidence further indicates that at the time that Howard committed suicide, Captain Johnson did not perceive him as a suicide risk.

Waller nonetheless asserts that because Howard told Captain Johnson that he did not want to "go back to the penitentiary," he must have recognized a risk of suicide. Dkt. No. 39 at 19. But as Captain Johnson explains in his declaration, "[n]ot wanting to go back

to the penitentiary is not uncommon among inmates." Dkt. No. 33-1 at 243. Howard's expression of this sentiment is thus "merely a scintilla of evidence that relies on extremely improbable inferences and speculation" to support the conclusion that Captain Johnson actually perceived a suicide risk and fails to create a genuine dispute of material fact. *See Melvin v. Karman*, 550 F. App'x 218, 220 (5th Cir. 2013).

Waller further contends that Captain Johnson's call with Sheriff Cogdill shortly after Howard's death shows that he perceived him as a suicide risk. Dkt. No. 39 at 34–35. Notably, however, during the portion of that call in which the two discussed Howard's death, Captain Johnson never indicated that he had any concern that Howard would commit suicide that night. Rather, Sheriff Cogdill stated that Howard's mother "kind of figured [Howard] would do something," to which Captain Johnson merely responded "mm-hmm." PX 32 at 4:11–14. No reasonable jury would interpret Captain Johnson's generic, discreet response as anything more than a polite acknowledgment of Sheriff Cogdill's statement concerning Howard's mother. Sheriff Cogdill continued on to say that Howard "ha[d] been to prison[,] and this would be his third time down," to which Captain Johnson stated, "Yeah that's the truth, he didn't want to go back. Sure didn't." *Id.* at 4:13–23. Again, no reasonable jury would interpret this statement as revealing that Captain Johnson believed that Howard would attempt suicide. It simply shows that Captain Johnson recognized that Howard did not want to go back to prison—which is consistent with his declaration and, as discussed above, is not significantly probative of the conclusion that he knew that Howard would attempt suicide if given the opportunity.

Waller lastly claims that the fact that Captain Johnson monitored Howard after witnessing his anger upon being served with the unexpected indictment shows that Captain

Johnson "actually made the inference that [Howard] was a serious risk of suicide." Dkt. No. 39 at 37. To be sure, the Fifth Circuit has held that even when an official "aver[s] that []he did not consider [an inmate] to be a suicide risk," a jury might "reasonably draw the inference from [the official]'s actions that []he was aware of a risk that [the inmate] would harm himself if given the opportunity." *Hyatt*, 843 F.3d at 178. For instance, in *Hyatt*, the Fifth Circuit determined that when the evidence showed that an official took precautionary measures to protect an inmate from self-harm—including withholding sheets and certain hygiene items and advising another jailer "of the need to keep an eye out for suspicious behavior" from the inmate—those measures supported an inference that the official "appreciated that [the inmate] presented a significant risk of suicide." *Id.*

By contrast, here, although Captain Johnson admittedly monitored Howard following his service of the indictments on him, the uncontroverted summary-judgment evidence refutes the conclusion that he did so because he perceived Howard to be a suicide risk. To the contrary, Captain Johnson affirms in his declaration that he only monitored Howard due to the concern that he would replicate a violent outburst similar to when he punched a wall two days earlier, particularly in light of Howard's pattern of similar outbursts when he did not get his way. Dkt. No. 33-1 at 242–43. And, as further stated in his declaration, despite his concern that Howard might act out in response to the news of an unanticipated charge, he did not perceive that Howard posed a threat to his own life. *Id.* Indeed, Captain Johnson specifically instructed the jailer on duty that day to watch for "violence"—not suicidal activity—from Howard. *Id.* at 242. Moreover, the record does not indicate that Captain Johnson took other measures that could be interpreted as an acknowledgment that Howard posed a suicide risk. He did not, for example, place Howard

on suicide watch or remove bed sheets from his cell.  *See id.* at 239–45.  Therefore, unlike

*Hyatt*, where the defendant's averment that she did not perceive an inmate as a suicide risk

conflicted with evidence of her own conduct, Captain Johnson's declaration is consistent

with the record, and Waller has failed to point to any competent evidence that rebuts it.

 Waller cites *Pena v. Starr County*, No. 7:22-cv-276 (S.D. Tex. Nov. 8, 2022), Dkt. No.

23, for the proposition that "alternative explanations" do not suffice to demonstrate the

absence of a genuine dispute of material fact.  Dkt. No. 39 at 11.  But *Pena* involved a

deliberate-indifference claim at the motion-to-dismiss stage, so the court expressly refrained

from considering evidence and, instead, decided whether the plaintiffs "had pled sufficient

facts" to support the claim that the defendants had drawn an inference that a substantial risk

of suicide existed.  *Pena*, No. 7:22-cv-276, Dkt. No. 23 at 10–11.  By contrast, here, the

Court considers Waller's deliberate-indifference claim at the summary-judgment stage,

which requires a party asserting that a fact is genuinely disputed to support that assertion

by citing evidence in the record, especially given that the burden rests with Waller to

overcome qualified immunity.  *See* Fed. R. Civ. P. 56(c)(1)(A).  But Waller has failed to

point to any competent evidence rebutting Captain Johnson's representations concerning his

mental state at the time of Howard's death.  Thus, because Captain Johnson's declaration is

uncontroverted and corroborated by other evidence before the Court, no issue concerning

his mental state remains, and a jury could not reasonably return a verdict against him.  *See*

*Anderson*, 477 U.S. at 249.

 The Court recognizes that "[s]ummary judgment is not appropriate when 'questions

about the credibility of key witnesses loom . . . large.'"  *Deville v. Marcantel*, 567 F.3d 156,

165 (5th Cir. 2009) (quoting *Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir.

2000)).  But "[a] motion for summary judgment cannot be defeated solely by conclusional allegations that a witness lacks credibility." *Id.* (quoting *Thomas,* 233 F.3d at 331).  And Waller has offered no evidence "that would allow the jury to disbelieve [Captain Johnson's] testimony." *See id.*  Therefore, although the Court is not entitled to "make credibility findings" at this stage, it need not do so.  *See Seigler v. Wal-Mart Stores Texas, L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022).  Captain Johnson's signed declaration was affirmed by him as true under penalty of perjury, attests to events of which he had personal knowledge, and is consistent with the record.  It thus serves as competent summary-judgment evidence.  *See Davis v. Fernandez*, 798 F.3d 290, 292 (5th Cir. 2015) (holding that a declaration was competent summary-judgment evidence when the declarant affirmed "that it was made under the penalty of perjury").  And because Waller has failed to rebut Captain Johnson's declaration with any competent evidence to the contrary, the Court is left to accept the representations within it.

For these reasons, although the evidence could support a finding that Captain Johnson was aware of facts from which he could have drawn the inference that Howard posed a substantial suicide risk, Waller fails to identify competent summary-judgment evidence that Captain Johnson actually drew that inference.  Whether he *should* have recognized a suicide risk is irrelevant under the law.  The uncontroverted evidence—even when viewed in Waller's favor—shows that he did not draw that inference at the time of the suicide, so no reasonable jury could find that he acted with deliberate indifference.  *See Crandel*, 2023 WL 4877464, at *4 (quoting *Converse*, 961 F.3d at 775).  Indeed, as the Fifth Circuit has emphasized, "'[s]uicide is inherently difficult . . . to predict, particularly in the depressing prison setting,' and an incorrect diagnosis regarding the genuineness of a suicide

threat does not amount to deliberate indifference." *Young v. McCain*, 760 F. App'x 251, 257 (5th Cir. 2019) (quoting *Domino*, 239 F.3d at 756). Accordingly, given the absence of evidence indicating that Captain Johnson actually perceived a suicide risk on the night of the event, no jury could find in Waller's favor, and her claim cannot survive summary judgment.[6]

## 5. Conclusion

Waller has failed to set forth competent summary-judgment evidence upon which a reasonable jury could determine that Captain Johnson violated Howard's clearly established Fourteenth Amendment rights. Although the evidence establishes that Captain Johnson knew of Howard's history of suicide attempts and self-harming behavior, Captain Johnson has thoroughly confirmed under penalty of perjury the reasons why he did not perceive Howard to be a suicide risk. Because other summary-judgment evidence corroborates Captain Johnson's declaration, and Waller has failed to point to any evidence to rebut it, the Court finds no genuine issue of material fact left for trial. Thus, the Court grants

---

[6] Even if the summary-judgment evidence did establish a genuine dispute as to whether Captain Johnson drew the inference that Howard posed a substantial risk of suicide, it fails to establish a genuine dispute as to whether Captain Johnson acted with deliberate indifference towards that risk. The Fifth Circuit recently held in *Cope* that jail officials did not act with deliberate indifference when they left an inmate who they knew posed a suicide risk in a cell with a lengthy phone cord—which the inmate used to hang himself one day later—because "the record d[id] not suggest that any inmate had previously attempted suicide by strangulation with a phone cord[,] nor [wa]s there non-speculative evidence that [the defendant-officials] were aware of this danger." 3 F.4th at 210. Here, even if Captain Johnson were aware that pursuant to Terry County Jail policy, Howard received access to mops—the instrument by which he ultimately carried out his suicide—no evidence suggests that he knew that Howard had been accumulating mop strings or was otherwise aware of any danger in leaving Howard in his cell despite the fact that he had received prior access to mops. Therefore, like the defendant-officials in *Cope*, Captain Johnson's failure to protect Howard from committing suicide in the manner that he did "did not violate a clearly established constitutional right." *Id.* at 211.

Captain Johnson's Motion for Summary Judgment on the Defense of Qualified Immunity

(Dkt. No. 31).

So ordered on August 18, 2023.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE